2021 IL App (5th) 210020-U

NO. 5-21-0020

NOTICE
Decision filed 07/16/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* K.K., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Effingham County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 18-JA-2 |
| v. | ) | |
| | ) | |
| Moira K., | ) | Honorable |
| | ) | Michael D. McHaney, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's finding that the respondent mother was unfit is affirmed where the State proved that she was unfit by clear and convincing evidence. The court's best-interest determination was also not against the manifest weight of the evidence.

¶ 2    The respondent mother, Moira K., appeals the judgment of the circuit court of Effingham County terminating her parental rights to her minor child, K.K. On appeal, Moira K. argues that the court's findings that she was an unfit parent under sections 1(D)(b), 1(D)(m)(i), and 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(b), (m)(i), (ii) (West 2020)) were erroneous because the State failed to prove her unfit by clear and

1

convincing evidence. Moira K. also argues that the court's finding that termination of her parental rights was in the best interests of K.K. was against the manifest weight of the evidence. For the reasons that follow, we affirm.[1]

¶ 3                                      I. BACKGROUND

¶ 4     K.K. was born on September 3, 2015, to Moira K. and her then-husband, Cody K. K.K. was born with cystic fibrosis. Shortly after her birth, she was temporarily removed from her parents' care for failure to thrive. She was placed with her maternal grandparents until Moira K. and Cody K. regained custody of her. Moira K. and Cody K. separated in November 2017. This appeal involves the termination of Moira K.'s parental rights to K.K. However, facts relating to Cody K. will be discussed as necessary to provide relevant background for the issues presented in this appeal.

¶ 5     On February 12, 2018, the State filed a petition for adjudication of wardship, asserting that K.K. was a neglected minor, along with a motion to have her placed in the temporary custody of the Illinois Department of Children and Family Services (DCFS). The petition first alleged that K.K. was neglected because she was not receiving the proper medical or remedial care or food necessary for her well-being. In support of protective custody, the petition alleged the following. Moira K. was K.K.'s custodian, and K.K. resided at Moira K.'s residence. K.K. was born with cystic fibrosis, requiring specialized

---

[1]This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). With respect to such cases, Rule 311(a)(5) provides, in relevant part, that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, the 150-day period to issue a decision expired on June 21, 2021. However, Moira K. was granted multiple extensions of time to file her appellant's brief. As a result, briefing in this appeal was not completed until June 14, 2021. Under these circumstances, we find good cause to issue our decision after the 150-day deadline.

medical care, including a special medication to help her digest food, special formula, and "g-tube" supplies. Moira K. was educated on the importance of K.K.'s medication and on how to administer the medication. Moira K. had also been instructed to use a specialized formula called "PediaSure," was educated on the importance of using an "air clearance vest" for a minimum of two times per day for 15 minutes at a time, educated on using a nebulizer for K.K.'s care, and given free nebulizer supplies. On January 24, 2018, K.K. was hospitalized for failure to thrive based on poor weight gain. Prior to her hospitalization, K.K. had lost weight, and her head had begun to "flatten," which was a sign of poor development. She was "terribly delayed" both physically and emotionally.

¶ 6    The petition further alleged that, according to K.K.'s physician, Moira K. was responsible for K.K.'s failure to thrive and failure to gain weight by failing to administer K.K.'s medication as prescribed, adequately feed K.K., provide the necessary medication to combat K.K.'s cystic fibrosis, utilize the air clearance vest, provide adequate amounts of PediaSure, and provide nebulizer treatments. The petition contained substantially similar allegations with respect to Cody K. Lastly, the petition alleged that it was a matter of immediate and urgent necessity that a shelter care hearing be held for K.K.'s protection, and that it was in her best interests that she be adjudged a ward of the court.

¶ 7    Also on February 12, 2018, the trial court entered a temporary custody order, finding that there was an immediate and urgent necessity to remove K.K. from her parents' care and that leaving K.K. in her home was against her health, welfare, and safety. The court found that there was probable cause for the filing of the petition, and that reasonable efforts had been made to keep K.K. in her home, but they had not eliminated the necessity for her

3

removal. Thus, temporary custody of K.K. was placed with DCFS. The court's docket sheet indicated that shelter care was ordered per agreement of Moira K. and the guardian *ad litem* (GAL).

¶ 8    On July 25, 2018, the trial court held an adjudicatory hearing, during which Moira K. confessed to the following allegations in the petition:

> "3. The minor child is NEGLECTED by reason of the following facts: The minor child is under the age of 18-years, and said minor child is not receiving the proper necessary medical or remedial care necessary for the child's well-being and said child is not receiving adequate food necessary for the child's well-being, pursuant to 705 ILCS 405/2-3(1)(a):
>
> REASONS FOR PROTECTIVE CUSTODY:
>
> > A. Moira [K.], Respondent Mother, is the custodian of said minor child and that she has neglected the said minor child for the following reasons:
> >
> > > ***
> >
> > > (2) That, the minor child was born with cystic fibrosis. Consequently, the minor child requires specialized medical care, including a special medication that allows the minor child to digest food. Also, the minor child requires special formula and 'g-tube' supplies. The Respondent Mother was educated on the importance of this medication and on how to administer this medication.
> >
> > > * * *
> >
> > > (8) That, according to the child's physician, the child's failure to thrive and the child's failure to gain weight is the result of at least one of the following fact(s):
> >
> > > * * *
> >
> > > c) Respondent parents' failure to provide the necessary medication necessary to combat the minor child's cystic fibrosis."

4

Cody K. confessed to these same allegations. The remainder of the allegations in the petition were dismissed. The trial court accepted the agreement of the parties, found that K.K. was neglected as alleged in the paragraphs confessed, and entered an adjudicatory order consistent with those findings.

¶ 9 On August 21, 2018, Lutheran Children and Family Services (LCFS) filed a dispositional report, which explained why the case was opened. On February 1, 2018, DCFS received a hotline report of medical neglect and failure to thrive against Moira K. and Cody K. regarding K.K., who was two years old at the time. At the time of the hotline call, K.K. was in Carle Foundation Hospital in Urbana, Illinois. She had been admitted on January 24, 2018, for failure to thrive as she was not gaining weight as she should. A doctor advised DCFS that Moira K. was neglecting K.K. by failing to provide the necessary medication, formula, and G-tube supplies as often as she should. Since being admitted to the hospital, K.K.'s weight had increased, and she was responding favorably to treatment, which was the same treatment that she was supposed to be receiving at home.

¶ 10 The doctor in charge of K.K.'s treatment, Dr. Donald Davison, reported to DCFS that K.K. required certain medication to aid her digestion of food, PediaSure to supplement her caloric intake, several nebulizer treatments each day, treatment with an air clearance vest twice a day for 15 minutes each, and other medication for treatment of cystic fibrosis. Dr. Davison further reported that he believed Moira K. was neglecting K.K. by failing to do what was required, even though Moira K. had been educated on the importance of said treatments and had been taught how to carry them out. Dr. Davison reported that his out-patient staff tried to work with the family to assist, advise, and prescribe therapies to help

K.K. grow, develop, and thrive, but it had been "a very frustrating process." Dr. Davison stated that K.K.'s parents were "killing her."

¶ 11 As to services provided, the dispositional report stated that LCFS identified the following: "need for [Moira K. and Cody K.] to cooperate with LCFS/DCFS, complete a mental health assessment and any services recommended, parenting education, complete a substance abuse assessment and any services recommended, maintain legal means of support, and safe and appropriate housing." At the time of the report, Moira K. had not enrolled in any services. The report also indicated that Moira K. had "been made aware that another requirement of her service plan is to also attend medical appointments that [K.K.] may have." Moira K. attended her first appointment with K.K. in May. The report further indicated that K.K. was thriving in her foster care placement, she was "on track health wise," Moira K. had not been consistent in visiting K.K., and the prognosis for reunification of the family was poor. Although Moira K. "verbalized willingness to cooperate with services directed toward reunification," she "continued to minimize and/or justify her responsibility in the neglect of [K.K.]." The report noted that Moira K. was previously indicated for neglect of K.K.'s needs but prior services failed to "establish lasted, needed change." It was also reported that Moira K. had been placed on "call and confirm" for visits on July 10 after an LCFS employee drove from Decatur to Charleston to pick her up, and she canceled at the last minute.

¶ 12 On August 30, 2018, Court Appointed Special Advocates (CASA) filed a report in anticipation of an upcoming dispositional hearing. The report detailed CASA's investigation into this case, including its caseworker's contacts with K.K., her foster

mother, the DCFS caseworker, and Moira K. The "CASA Concerns" at that time were that Moira K. was not attending visitations with K.K. on a regular basis; she did not go to scheduled doctor visits, which was a part of her service plan; and she was not completing her service plan. The report noted that K.K. was doing well and thriving in her foster care placement.

¶ 13 On September 5, 2018, the trial court held a dispositional hearing. The parties stipulated to the dispositional reports filed August 21, 2018, by LCFS, and August 30, 2018, by CASA. The court accepted the stipulation. After the hearing, the court entered a written dispositional order, finding that it was consistent with K.K.'s health, welfare, and safety, and in her best interests, that she be a ward of the court. The court further found that Moira K. was unfit and unable to care, protect, train, educate, supervise, or discipline K.K., and K.K.'s placement with her would be contrary to her health, safety, and best interests. The court awarded custody and guardianship to DCFS. The court found that the service plan was appropriate, set an initial permanency goal to return K.K. to her home within 12 months, and scheduled a permanency review hearing for February 27, 2019.

¶ 14 On February 20, 2019, CASA prepared a report in anticipation of an upcoming permanency review hearing, which stated that K.K. seemed very happy and was thriving in her foster care placement; she had started calling her foster parents "mom" and "dad"; and she interacted well with her foster brothers and sisters. It was reported that on December 19, 2018, Moira K.'s caseworker stated that, "as far as he knew Moira had not had her mental health assessment, has not been to parenting classes and [had] not made any effort to learn more about [K.K.]'s medical condition. She had also not been to visit

7

[K.K.] in a month." On January 21, 2019, Moira K.'s caseworker reported that he did "not feel that Moira is capable of taking care of [K.K.] due to her lack of understanding of her medical needs." CASA's concerns were that Moira K. had failed to attend all her visitations with K.K., failed to attend parenting classes, missed one of K.K.'s scheduled doctor's appointments, had not completed her mental health evaluation, did not have reliable transportation, and had several job changes in the last year.

¶ 15 On February 22, 2019, LCFS prepared a permanency review report, which stated that:

> "Lutheran Children and Family Services recommends that [Moira K.] participate in and complete the following services: maintain a legal means of support and appropriate housing, participate in parenting classes, individual counseling services, obtain mental health and substance abuse assessments, cooperate with LCFS/DCFS, and attend parent/child visitation as well as doctor's appointments."[2]

It was reported that Moira K. was relatively stable in that she had a means to support herself through employment. As to parenting, she had been referred to a provider but had not engaged in the service. It was reported that the most important part of this service was that she learn to cope with K.K.'s cystic fibrosis, but she had "yet to have approval to even feed [K.K.] during visitation." Moira K. had yet to obtain a mental health assessment. She had cooperated by keeping the agency informed of her life changes such as contact information, but she was still not fully engaged in services. Her level of involvement in visitation was somewhat inconsistent, and she had not attended all of her offered visits. She had also

---

[2]Although a copy of the service plan was not in the record, the LCFS reports similarly described the services recommended for Moira K.

attended medical appointments. The permanency goal remained to return K.K. home within 12 months.

¶ 16 On February 27, 2019, the trial court held a permanency hearing during which the LCFS permanency review report and the CASA status report were introduced as evidence. After the hearing, the court entered a written permanency order, finding that Moira K. had not made reasonable and substantial progress toward returning K.K. to her home. The court further found that the services in the service plan were appropriate and reasonably calculated and that the services had been provided. The permanency goal remained to return K.K. home within 12 months. The court ordered that custody and guardianship were to remain with DCFS or its designee.

¶ 17 On July 10, 2019, CASA prepared a report in anticipation of an upcoming permanency review hearing, which again detailed CASA's investigation. It reported that K.K. was thriving in her foster home, and her foster parents were very attentive to her medical needs. The report further indicated that Moira K. missed at least two scheduled visits with K.K., had not completed her service plan, was not working toward completing it, and failed to attend a meeting with K.K.'s medical team. CASA's concerns were that Moira K. failed to attend her mother-child visits and had not seen K.K. for several months, Moira K. was not participating in any part of her service plan, she missed two scheduled doctor's appointments, K.K.'s doctor felt that Moira K. was not capable of providing K.K. with the specialized care that she needed, and Moira K. did not have reliable transportation or a consistent job. CASA concluded that it was in K.K.'s best interests to remain with her

foster parents, and the agency planned to move forward with legal screening and termination of Moira K.'s parental rights.

¶ 18 On July 15, 2019, LCFS prepared a permanency review report, which stated that Moira K. was still relatively stable as she lived with, and was primarily supported by, her paramour. She was attending weekly parenting classes but had yet to attend a mental health assessment. She was still not fully engaged in services. It was further reported that she was involved with visitation, but K.K.'s move had created a considerable distance for the visits to occur. LCFS had attempted to facilitate visits during the transition in May, but those visits were missed. K.K.'s foster parents had offered to meet Moira K. halfway to provide visitation, but a central location had not yet been cemented. It was also noted that Moira K. missed K.K.'s last medical appointment. At that appointment, Dr. Davison expressed to the caseworker that, while he felt that Moira K. had the knowledge, he did not feel that she had the initiative to do what was necessary for K.K.'s health. He believed that K.K.'s foster mother was doing everything that K.K. needed, so he believed K.K. should stay in that placement. The recommended permanency goal was to return K.K. home within 12 months to allow Moira K. additional time to correct the conditions that brought K.K. into care.

¶ 19 On August 22, 2019, LCFS prepared another permanency review report, which stated that Moira K. previously engaged in parenting classes, with her last appointment being in April 2018. She had since resumed contact with the service provider to begin her classes once more. She had not obtained a mental health assessment, but she had reached out to a service provider to get such an assessment. She was still not fully engaged in

services, but she had attended a visit with K.K. The permanency goal was changed to substitute care pending a court determination on termination of parental rights. In support of this change, it was reported that Moira K. had not yet fully engaged in services in the year since adjudication. K.K. had a strong bond with her foster family, who had signed a commitment to permanency up to and including adopting K.K. They had done what was required by K.K.'s complex medical needs, and K.K.'s doctor supported their adoption of her. On the other hand, Dr. Davison did not support Moira K. having K.K. in her care based on her two previous incidents of "maltreatment." Dr. Davison's professional opinion was that Moira K. would once again neglect K.K.'s medical needs and cause her to either be returned to care or worse outcomes.

¶ 20 On August 28, 2019, the trial court held a permanency hearing. Although the State requested that the permanency goal be changed to substitute care pending termination of parental rights, the court declined to change the goal because the legal screening had not yet been completed. Thereafter, the court issued a written permanency order where it found that the appropriate permanency goal was to return K.K. home within 12 months. It found that Moira K. had not made reasonable and substantial progress toward returning K.K. home.

¶ 21 On November 18, 2019, LCFS prepared another permanency review report, which stated that Moira K. completed her parenting classes in September 2019. She was on the waitlist for a mental health evaluation but had been referred to a psychologist for an evaluation. She was still not fully engaged in services. She was visiting K.K. once per week but failed to attend K.K.'s medical appointments. It was reported that "a path needs

11

to be made for [Moira K.] to engage more with [K.K.]'s medical care as it is the reason the case came into care." LCFS again recommended that the permanency goal be substitute care pending termination of parental rights. The reason for the recommended goal change was that engagement with K.K.'s medical care was one of the most important factors in the case, and K.K.'s medical team did not believe in Moira K.'s ability to parent a child with cystic fibrosis. K.K.'s medical team believed that if she were to be returned to Moira K.'s care, Moira K. would once again neglect the child and endanger her life.

¶ 22   On February 4, 2020, CASA prepared a report in anticipation of an upcoming permanency review hearing, which reported that Moira K. had made minimal progress on her service plan, and K.K. was thriving in her foster care placement. On October 11, 2019, it was noted that Moira K. had completed her parenting classes but had not had her mental health evaluation. Moira K. had visited K.K. but had missed some scheduled visitations, one doctor's appointment, and a meeting with the CASA volunteer. On January 22, 2020, it was reported that the legal screening packet had been completed, mailed off, and the caseworker was waiting for it to be processed. Once again, listed as one of CASA's concerns was Moira K. missing three of K.K.'s scheduled doctor's appointments and K.K.'s doctor's feeling that Moira K. was not capable of providing the specialized care that K.K. needed. CASA recommended, based on K.K.'s best interests, that custody and guardianship remain with DCFS, K.K. remain with her foster parents, DCFS move forward with legal screening and termination of parental rights, and K.K. receive counseling.

¶ 23   On February 6, 2020, LCFS prepared another permanency review report, which stated that Moira K. was scheduled to undergo a full psychological assessment. Moira K.

12

visited K.K. weekly but had not attended any of K.K.'s medical appointments since February 2019. K.K.'s medical team did not trust that Moira K. would exercise the skills necessary to take care of K.K. LCFS recommended that the permanency goal be changed to substitute care pending termination of parental rights. It reported that it was in K.K.'s best interests that Moira K.'s rights be terminated because she could not adequately meet K.K.'s medical needs. Given the evidence of Moira K.'s involvement in K.K.'s treatment (such as not attending appointments), K.K.'s medical team did not believe that Moira K. would maintain K.K.'s health and did not support a return home goal.

¶ 24 On February 12, 2020, the trial court held a permanency hearing. At that time, the legal screening packet had been submitted but not yet approved. Thereafter, the court issued a written permanency order where it found that the appropriate permanency goal was to return K.K. home within 12 months. It found that Moira K. had not made reasonable efforts toward returning K.K. home.

¶ 25 On March 30, 2020, the State filed a motion for termination of parental rights and for appointment of a guardian with power to consent to adoption against Moira K. and Cody K. On May 27, 2020, the State filed its amended motion for termination of parental rights and for appointment of a guardian with power to consent to adoption. The amended petition alleged that Moira K. and Cody K. were unfit to have K.K. under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)) in that they failed to make reasonable efforts to correct the conditions that were the basis for K.K.'s removal during the nine-month period between June 19, 2019, and March 18, 2020, after the adjudication of neglect; under section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii))

13

in that they failed to make reasonable progress toward K.K.'s return during the nine-month period between June 19, 2019, and March 18, 2020, after the adjudication of neglect; and under section 1(D)(b) of the Adoption Act (*id*. § 1(D)(b)) in that they failed to maintain a reasonable degree of interest, concern, or responsibility as to K.K.'s welfare between June 19, 2019, and March 18, 2020.  The State contended that it was in K.K.'s best interests that Moira K. and Cody K.'s rights be permanently terminated, and that K.K. be placed in DCFS guardianship.

¶ 26    On July 8, 2020, CASA prepared a report in anticipation of an upcoming permanency review hearing, which again detailed its investigation into this case.  It was reported that Moira K. was not progressing on her service plan, she had missed video chats with K.K. but was overall doing better at attending visitations, and she had missed "quite a few" of K.K.'s doctor appointments, which were necessary for her to understand how to care for K.K.'s medical needs.  It was also reported that K.K. was doing well in her foster care placement, and her foster parents were "very attentive" to her many medical needs.  CASA recommended that it was in K.K.'s best interests that the goal be changed to termination of parental rights.

¶ 27    On July 9, 2020, LCFS prepared another permanency review report, which stated that Moira K. was relatively stable, had completed her parenting classes and a full psychological examination; kept the agency informed on changes in her life; and visited K.K. during quarantine when possible.  However, Moira K. had only attended one of K.K.'s medical appointments in the past year.  K.K.'s medical team did not recommend that she be returned to Moira K.'s care because they did not trust that she would exercise the

14

necessary skills to take care of K.K. LCFS recommended that the permanency goal be set to substitute care pending a court determination on parental rights. It was reported that the goal change would be in K.K.'s best interests because the reason she came into care—medical neglect—had not been addressed. While Dr. Davison felt that Moira K. could not care for K.K.'s medical needs, K.K.'s foster parents had gotten her to all appointments, met her medical needs, and she was doing well.

¶ 28 After several delays involving serving notice upon Cody K., the trial court conducted a fitness hearing on November 4, 2020. Roger Fitzgerald-Jackson, a child welfare specialist with LCFS, testified on behalf of the State. Fitzgerald-Jackson had been employed by LCFS for over three years, and his duties were to ensure the welfare of children in care, as well as to work toward reunifying children with their families. He was assigned to K.K.'s case in November 2018; at that time, he reviewed the service plan, attempted to meet with the family, and checked on K.K.'s welfare. As part of Moira K.'s service plan, she was required to do parenting, mental health, and substance abuse services; medical training; and provide stability. She was also asked to obtain suitable employment. During the relevant nine-month period, Moira K. completed parenting services. However, she did not complete mental health services, nor did she get a substance abuse test. She did not complete medical training or attend medical appointments during that time. Her employment was "on and off" during the relevant time period.

¶ 29 Fitzgerald-Jackson was specifically asked about Moira K.'s service plan requirements relating to K.K.'s medical conditions. Moira K. was required to "get medical training approved by the Cystic Fibrosis Team at Carle. She was also to attend all of the

15

appointments which were on a three-month basis to understand and know how to deal with her daughter's condition." He explained that the medical training involved the specialized tools that were used as part of K.K.'s care. During the relevant nine-month period, K.K. had three medical appointments with her cystic fibrosis medical team led by Dr. Davison. Moira K. did not participate in any of these appointments. Fitzgerald-Jackson acknowledged that Moira K. had transportation issues, but she did not reach out to DCFS in time for the department to provide her with transportation to K.K.'s appointments.

¶ 30 This was not the first time K.K. had been taken into care. The first time was shortly after she was born, also for medical neglect and failure to thrive. Moira K. completed her service plan requirements, and K.K. was returned to her care; approximately one year passed before K.K. was again taken into care because of this case.

¶ 31 Fitzgerald-Jackson was then asked about K.K.'s condition when she came into care on this case. He testified that she was severely underweight, failing to thrive, and had to be in an intensive care unit for several days. He further stated that "the status of her equipment, which is important, her vest, which is suppose[d] to be used every day, was used 22 hours out of 555 days. She had only had four months out of eight months of refills of PediaSure, and she only had her Creon, which are important enzymes to digest fluid, two out of six months."

¶ 32 When asked, looking at the history of the case and considering the relevant nine-month period, what concerns he had about Moira K., Fitzgerald-Jackson testified:

> "I have continued concerns with [Moira K.] due to the fact that while she did complete parenting, there is a four month delay in completion of that parenting which she completed during the time period. She didn't complete her mental health

16

or substance abuse services without the intervention of the department. She missed a significant number of visits during her, during that time period in order to make sure and maintain the bond with her daughter.

And the medical portion is really the important part, which was the reason that [K.K.] was brought into care. Without the accurate knowledge of meeting with the medical team in August or November of 2019, she did not have adequate knowledge to effectively take care of her child. And so without that, I cannot say that the child would be safe in her custody."

¶ 33 On cross-examination, Fitzgerald-Jackson explained that, to his knowledge, some of Moira K.'s missed visitations were rescheduled, and others were canceled due to transportation issues, weather, or not confirming with the caseworker in time. To his knowledge, Moira K. did not have her own vehicle and relied on her boyfriend for transportation.

¶ 34 Thereafter, the State rested. Moira K. did not testify or present any other evidence. Cody K. failed to appear and was found to be in default. The trial court then ruled that the State had met its burden of proving Moira K. to be unfit pursuant to the applicable provisions of the Adoption Act and as pleaded in the amended motion to terminate parental rights. The court stated that it was not basing its ruling on Moira K.'s lack of employment. Rather, it announced that the basis of its ruling was "medical."

¶ 35 On December 28, 2020, CASA prepared a report in anticipation of the upcoming best-interests hearing, which again detailed its investigation into this case. It was reported that K.K. continued to do well in her foster care placement. It was also reported that Moira K. had not been engaged, missed more doctor's appointments, and cancelled at least one visit with K.K. One of the CASA concerns listed was that the CASA volunteer felt it would be detrimental to K.K.'s well-being if she were returned to Moira K. The report

17

recommended that K.K. remain with her foster parents and that the trial court terminate Moira K.'s parental rights to allow K.K.'s foster parents to proceed with adoption.

¶ 36    On December 31, 2020, a best-interests report was filed by LCFS, which stated:

> "[Moira K.] attended 3 of the 10 doctors' appointments since this caseworker has had the case.  The last appointment was on December 8th, 2020, by video and she attended it.  [Moira K.] reported difficulties in attending several of the appointments due to lack of transportation, weather, or other issues.  These appointments are key to her services and to the health of her daughter as they address the reasons that the child is in care.  [K.K.] has cystic fibrosis and so has an appointment approximately every 90 days to check her condition, make appropriate medication changes, check her weight, growth and other metrics to ensure that she is relatively healthy with her condition.  If these metrics change to a significant degree, then it could be indicative of a major issue with [K.K.'s] health.  Additionally, due to [K.K.'s] condition, [Moira K.] was recommended to do medical training to ensure that she had the ability and knowledge to give her daughter medication, use her medical devices, and know how to spot major issues.  She completed this training in late September of 2020.  However, given the lack of involvement in [K.K.'s] medical treatment thus far the agency can not consider this service to be successful.  She needs to continue to display her willingness to attend appointments to understand the current status of [K.K.'s] health to effectively parent her and ensure her safety.  This is further reinforced by the fact that it is not the first time this child has been in care due to failing to thrive on the part of [Moira K. and Cody K.]."

The report detailed K.K.'s attachment to her foster parents and the progress she made since being placed with her foster family.  LCFS acknowledged that K.K. "is a very medically complex child with a great deal of needs."  However, it found that her foster family was taking care of her needs with no apparent issues.  "The same could not be said for [Moira K. or Cody K.] who in the first two years of [K.K.'s] life had her in the hospital for failure to thrive not once but twice."  K.K. indicated that she wanted to live with her foster family; she referred to her foster parents as "mom" and "dad" and identified her foster siblings as her sister and brothers.  On the other hand, K.K. referred to Moira K. as "Moira," rather than acknowledging her as her mother.  Lastly, the report found that K.K. was a part of her

18

local community through her foster parents' church and church membership. LCFS concluded that it was in K.K.'s best interests that she remained with her foster family for purposes of adoption, and that Moira K. and Cody K.'s parental rights be terminated in order to facilitate the adoption.

¶ 37    On January 6, 2021, the trial court conducted a best-interests hearing. The State presented the testimony of Dr. Davison, Fitzgerald-Jackson, and Jacqueline Reside. Dr. Davison initially testified as to his medical training and history with treating pediatric cystic fibrosis patients. He had been treating K.K.'s cystic fibrosis since July 2016; he described her symptoms and treatments. Dr. Davison testified that Moira K. received ongoing education about cystic fibrosis and how to care for it. He acknowledged that the care routine required was "a lot of work," and the therapies and medications could take up to "several hours a day." The standard of care required four doctor's appointments per year, every year, with the potential for additional visits due to problems, concerns, or illnesses. A patient could also require hospitalizations.

¶ 38    Dr. Davison was asked how K.K. had progressed from the first time he started treating her until the date of the hearing, to which he responded:

> "When we first met [K.K.], her weight was—if we look at weight percentile, it was between the 25th and 50th percentile for a child. Her old growth charts, when she had gone to foster care, went from the 5th up to the 25th to 50th percentile.
> Once back in her mother's care, her weight plateaued and started falling off the growth charts. And so it was falling off percentiles. We worked with that for about 18 months making adjustments in food, adjustments in medications, careful follow-up.
> We noted that at least on several—when she would come, she would have a bowel movement. Which showed that she had what's called malabsorption. *** Ultimately until we hospitalized her. That was, I think, right at the end of January or maybe the first of February of 2018.

19

And then at that time, we put her in the hospital to try to figure out why she was not growing. What we did was start off with our routine care. What food, the medicines we had been prescribing. Particularly those enzymes. And the tube feedings. Within 48 hours, all of her severe GI symptoms had disappeared. And she had rather dramatic weight gain."

Dr. Davison testified that therapies employed at the hospital were the same that should have been performed at home. When asked how confident he was that Moira K. understood the nature and specialized care that K.K. needed, he testified that prior to K.K.'s hospitalization, Moira K. could recite what she was supposed to do and how she was supposed to do it, indicating that she was knowledgeable about the care. Moira K. expressed that she did not understand why K.K. was not gaining weight.

¶ 39    Once K.K. went into care and was receiving the necessary therapies, K.K.'s medical team saw "a dramatically different result." She gained "huge amounts of weight." Dr. Davison believed she had "blossomed and done remarkably well" in her foster parents' care. Dr. Davison was concerned if there would be another disruption in K.K.'s care. He testified that this was "the second time she's been in foster care, basically for the same issue. Each time this has happened, it's creating injury. And the data says we are shortening her life by doing this."

¶ 40    Fitzgerald-Jackson again testified as to Moira K.'s service plan and what progress she made on her services. He observed some of Moira K.'s visits with K.K. and recalled that they typically consisted of the two playing a game or playing on a tablet. Moira K. was inconsistent with her visitations, attending 17 of the 26 visitations that occurred during the relevant time period. When asked whether DCFS would help Moira K. attend K.K.'s doctor's appointments, he testified that they made her aware of the appointments, but it

20

was her obligation to attend them. While Fitzgerald-Jackson was assigned to the case, Moira K. attended 3 out of 10 appointments.

¶ 41 Fitzgerald-Jackson was asked what differences or changes he had seen in K.K. since the beginning of the case. He responded:

> "I have seen that K.K. has been very healthy. Last year she had her G-tube removed, due to the fact that she was eating better and she was doing better in terms of her gastrointestinal health. But I know that Dr. Davison probably testified to the medical issues.
> I did note that the bond between [Moira K.] and the child changed. Not on Moira's end, but on the child's end. Where the child began to refer to [Moira K.] by her first name, as opposed to calling her mom. And even when I or any of my agency aides would attempt to correct her, she would say, 'No. That's not mom. That's Moira.' "

¶ 42 When asked about K.K.'s safety and welfare in her foster care placement, Fitzgerald-Jackson was "more than satisfied" with her foster parents' progress with the child in their home. They did what they could to attend to K.K.'s educational, physical, and mental needs. He did not have any concerns with K.K.'s placement with her foster parents. He indicated that they were trying to work through an issue with K.K.'s education, but he intended to set her up with a pediatric neurologist. He had observed K.K. with her foster family when he visited her three times monthly. He noted that she was bonded with her foster siblings; five of which lived in the home and three of which were adopted or were biological children of the foster parents. He also testified that K.K. interacted with both of her foster parents in a parental way, such as calling them mom and dad. She went to them when she was scared, seeking comfort, or hurting in any way. K.K. was integrated into their lifestyle in that she attended church services and programs with them. He concluded that she interacted with them as if they were her family.

21

¶ 43 Fitzgerald-Jackson was then asked what concerns he had if K.K. were to be placed back in Moira K.'s care. He testified that he did not feel that Moira K. would take care of K.K.'s medical needs, and the child would fail to thrive a third time.

¶ 44 On cross-examination, Fitzgerald-Jackson stated that the issue that caused Moira K. to miss her visits with K.K. was lack of transportation, the weather, or Moira K.'s failure to contact the caseworker in time to facilitate the visit. If Moira K. had given the department the advance notice required, they would have provided her with transportation to the visit. He testified that Moira K.'s visits with K.K. were not harmful in any way; Moira K. engaged with K.K. and tried to do things that interested the child. However, prior to receiving medical training as part of her service plan, Moira K. was not allowed to feed K.K. during this case. He believed that K.K. wished to formally be a part of her foster family. When asked whether ongoing contact with Moira K. would be confusing or troubling to K.K., he testified that K.K. did not necessarily see Moira K. as her mother. Instead, he thought K.K. considered Moira K. as "maybe even a family friend or a relative of" her foster family that she saw occasionally. He opined that it would be traumatic for K.K. to be removed from her foster family's home.

¶ 45 Jacqueline Reside, K.K.'s foster mother, testified that K.K. had been living with her family since February 12, 2018. The Resides had three foster children at the time of the hearing, as well as two adopted children and one biological child. They previously fostered a child with cystic fibrosis and knew that K.K. suffered from the disease when she came into their care. Reside testified that she was familiar with the kinds of treatment and specialized care required for a child with cystic fibrosis. When K.K. first came into the

Resides' care, she was "very small for her age," "[v]ery underweight," had head lice, and was being fed PediaSure through a G-tube. Reside spent several days and nights at the hospital so she could be trained on how to care for K.K.'s medical needs. Reside testified about K.K.'s routine and various treatments while she was in the Resides' care. Although it was a slow process, K.K. began to improve. Reside testified that K.K. began eating more and more by mouth, but she would vomit so they kept working with the doctors to address those concerns. In the couple of years prior to the hearing, K.K. had grown to be over the 70th or 75th percentile in weight and height, and she had her G-tube removed in November 2019. The Resides worked with K.K.'s gastrointestinal doctors, and she was no longer vomiting. Reside concluded that K.K. was "doing really well."

¶ 46 Reside testified that she and her husband were a team, who both participated in the care and education of their children. Reside had a "great relationship" with K.K., who was "very snuggly" and loved to be held. K.K. also loved to read and do her hair and nails. Reside testified that they had a girls' weekend a couple months ago, and there was "lots of bonding and fun times." Reside testified that she and her husband wanted to adopt K.K., they fully understood the long-term commitment it would be to care for her special needs, and they would continue to work with K.K.'s medical team on a regular basis if questions or issues arose.

¶ 47 Lora Heiden, Moira K.'s mother, testified that she and Moira K. received information from K.K.'s doctors as to how to care for her, and they were cooperative with that. K.K. was placed into Heiden's care by DCFS in June 2016 and remained in her care until August 2016, when she was returned to Moira K.'s care. Heiden believed it was in

23

K.K.'s best interests to be returned to Moira K.'s care. When the case began, Moira K. was "in a situation that was not conducive for herself probably or her child." Since Moira K. ended her relationship with Cody K., she had been more herself, outgoing, and motivated. Heiden believed Moira K. was more capable of being able to focus on K.K.

¶ 48 Moira K. testified that she had separated from Cody K. She was overwhelmed and scared when K.K. was diagnosed with cystic fibrosis. She received training as to how to care for K.K. and the various treatments she would require. She testified that it was difficult to care for K.K. with Cody K. around. When she started working, Cody K. was not consistent with K.K.'s care, so K.K.'s condition went downhill, and Moira K. quit her job. After K.K. was returned to Moira K. and Cody K.'s care after being placed with Heiden, the situation with Cody K. became worse and Moira K. decided to leave with K.K. They had been separated for a few weeks when K.K. had to be hospitalized and DCFS initiated this case.

¶ 49 Moira K. testified that after K.K.'s foster family moved, it was difficult to arrange transportation and schedule visits. She felt like DCFS did not do everything they could to help her reunite with K.K.; she did not feel like they listened to her, communicated with her, or cooperated with her needs. Although she did not think they were intentionally working against her, she did not feel like they were there for her. She testified that she received medical training in September 2020, and she understood what was required for K.K.'s care. She thought it was in K.K.'s best interests that K.K. be returned to her care.

¶ 50 On cross-examination, Moira K. testified that her current transportation was more consistent because she and her significant other finally had a reliable vehicle. She admitted

24

that throughout 2017, 2018, and most of 2019, she was not involved in any medical training. She had not been employed for approximately 13 months prior to the hearing. She described her virtual visits with K.K. as very difficult, but her last in-person visitations went "[r]eally well." She felt she had a strong bond with K.K., and that K.K. had a strong bond with her, but agreed there was "some disconnect in who she views me as in her life." On recross-examination, Moira K. clarified that she received medical training when K.K. was first diagnosed with cystic fibrosis and during the first hospitalization.

¶ 51 After hearing the evidence, the trial court ruled that the State met its burden of proof and found that it was in K.K.'s best interests that Moira K.'s parental rights be terminated. The court stated, "The difficulty in this case is that the interruption in care has already caused damage and decreased life expectancy. And there's nothing in this record to convince this Court that that interruption would not occur in the future."

¶ 52 After the best-interest hearing, the trial court entered a written order terminating parental rights, finding that Moira K. had been found unfit and that termination of her parental rights was in K.K.'s best interests. The court also noted that Cody K. had defaulted. Moira K. filed her notice of appeal on January 21, 2021.

¶ 53                                    II. ANALYSIS

¶ 54 Moira K. initially argues that the trial court erred in finding her unfit under sections 1(D)(b), 1(D)(m)(i), and 1(D)(m)(ii) of the Adoption Act (*id*. §§ 1(D)(b), (m)(i), (ii)) because the State failed to prove her unfit by clear and convincing evidence. She additionally contends that the court's best-interest determination was against the manifest weight of the evidence.

¶ 55                          A. Fitness Determination

¶ 56    Termination of parental rights proceedings are governed by the Juvenile Court Act

of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption

Act (750 ILCS 50/0.01 *et seq.* (West 2020)).  *In re D.F.*, 201 Ill. 2d 476, 494 (2002).  A

petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act,

which delineates a two-step process in seeking to terminate parental rights involuntarily.

705 ILCS 405/2-29(2) (West 2020).  The State must first establish, by clear and convincing

evidence, that the parent is an unfit person under one or more of the grounds of unfitness

enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)).  705

ILCS 405/2-29(2), (4) (West 2020); *In re D.F.*, 201 Ill. 2d at 494-95.  Because each of the

statutory grounds of unfitness is independent, the trial court's finding may be affirmed

where the evidence supports a finding of unfitness as to any one of the alleged grounds.

*In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 57    Our courts have recognized that parental rights and responsibilities are of deep

importance and should not be terminated lightly.  *In re K.B.*, 314 Ill. App. 3d 739, 748

(2000).  Thus, parental rights may be terminated only after a finding of unfitness that is

supported by clear and convincing evidence.  *In re Gwynne P.*, 346 Ill. App. 3d 584, 590

(2004).  A finding of unfitness will not be disturbed unless it is against the manifest weight

of the evidence.  *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004).  A finding is against the

manifest weight of the evidence only if the opposite conclusion is clearly apparent or the

determination is unreasonable, arbitrary, or not based on the evidence.  *In re D.F.*, 201 Ill.

2d at 498.  A trial court's finding of unfitness is given great deference because it has the

best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). A reviewing court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 58 Here, the trial court found Moira K. unfit for the following three grounds: (1) under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)), she failed to make reasonable efforts to correct the conditions that were the basis for K.K.'s removal during a nine-month period after the adjudication of neglect, specifically between June 19, 2019, and March 18, 2020; (2) under section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)), she failed to make reasonable progress toward K.K.'s return during a nine-month period after the adjudication of neglect, specifically between June 19, 2019, through March 18, 2020; and (3) under section 1(D)(b) of the Adoption Act (*id.* § 1(D)(b)), she failed to maintain a reasonable degree of interest, concern, or responsibility as to K.K.'s welfare between June 19, 2019, and March 18, 2020.

¶ 59 Reasonable efforts and reasonable progress are two distinct grounds of unfitness under section 1(D)(m). *In re Daphnie E.*, 368 Ill. App. 3d at 1066. Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child and are judged by a subjective standard based upon the amount of effort that is reasonable for that particular parent. *In re R.L.*, 352 Ill. App. 3d at 998. The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. In contrast, reasonable progress is judged using an objective standard that focuses on

27

the steps the parent has taken toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. The standard by which progress is measured is the parent's compliance with the court's directives and the service plans in light of the conditions that gave rise to removal and other conditions that later become known and would prevent the court from returning custody of the child to the parent. *Id.* "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 60 The State identified the relevant nine-month period for reasonable efforts, reasonable progress, and a reasonable degree of interest, concern, or responsibility as to the child's welfare as June 19, 2019, through March 18, 2020.

¶ 61 The record reveals that K.K. was brought into care because she was failing to thrive, was severely underweight, and had to be hospitalized in the intensive care unit for several days. It was also reported Moira K. was not properly caring for K.K.'s cystic fibrosis, which Dr. Davison believed was killing K.K. Throughout the life of the case, Moira K.'s service plan tasks were to (1) maintain a legal means of support and appropriate housing, (2) participate in parenting classes, (3) participate in individual counseling services, (4) obtain mental health and substance abuse assessments, (5) cooperate with LCFS/DCFS, (6) attend parent/child visitation as well as doctor's appointments, and (7) attend medical training. During the relevant nine-month period, Moira K. completed parenting classes, was relatively stable with appropriate housing, completed a full psychological examination, and kept the agency informed on changes in her life. She did not complete

28

mental health services or get a substance abuse test. Her employment was "on and off." She attended 17 out of 26 scheduled visits with K.K.

¶ 62 Nevertheless, the record reveals that Moira K.'s most important service related to understanding and demonstrating that she knew how to care for K.K.'s medical needs. This was supported by Fitzgerald-Jackson's testimony at the fitness hearing that Moira K. was required to "get medical training approved by the Cystic Fibrosis Team at Carle. She was also to attend all of the appointments which were on a three-month basis to understand and know how to deal with her daughter's condition." This was also supported by the various reports filed by LCFS and CASA in this case. Every report filed by LCFS indicated that attending K.K.'s medical appointments was a requirement of Moira K.'s service plan. Similarly, the permanency review report filed by LCFS on November 18, 2019, stated that Moira K. needed to "engage more with [K.K.'s] medical care as it is the reason the case came into care."

¶ 63 We find that Moira K. failed to complete the service plan tasks relating to K.K.'s medical needs during the relevant nine-month period. During that time, K.K. had three medical appointments with her cystic fibrosis medical team led by Dr. Davison. Moira K. failed to participate in any of these appointments. Although she participated in medical training in September 2020, this was outside of the relevant nine-month period. Fitzgerald-Jackson emphasized the importance of the medical portion of Moira K.'s service plan because it was the reason that K.K. was brought into care. Due to her failure to attend K.K.'s medical appointments in August or November of 2019, she did not have adequate knowledge to effectively take care of K.K. Without that knowledge, Fitzgerald-Jackson

29

did not believe K.K. would be safe in Moira K.'s custody. The LCFS and CASA reports filed during the relevant nine-month period indicated that K.K.'s medical team felt the same. It was repeatedly reported that K.K.'s doctor did not trust Moira K.'s ability to care for K.K.'s medical needs and felt that if K.K. were returned to Moira K.'s care, Moira K. would once again neglect the child and endanger her life.

¶ 64 On appeal, Moira K. insists that her transportation issues should excuse her lack of participation in K.K.'s medical appointments. However, Fitzgerald-Jackson acknowledged at the fitness hearing that Moira K. had transportation issues. He also testified that, if she had contacted DCFS in time, the department would have provided her with transportation. She failed to do so.

¶ 65 Based on the evidence presented at the fitness hearing and Moira K.'s failure to demonstrate that she was capable of caring for K.K.'s medical needs, we agree with the trial court's conclusion that the State proved by clear and convincing evidence that Moira K. was unfit in that she had not made reasonable efforts or progress during the nine-month period immediately following the adjudication of neglect. Having determined there was adequate evidence to satisfy two statutory grounds of unfitness, we need not address the other finding of unfitness made by the trial court. See *In re C.W.*, 199 Ill. 2d at 217.

¶ 66                              B. Best-Interest Determination

¶ 67 If the trial court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2020); *In re D.F.*, 201 Ill. 2d at 495. Following a finding of parental unfitness, the focus shifts entirely to the child. *In re D.T.*, 212 Ill. 2d

30

347, 364 (2004). At the best-interest stage, all considerations must yield to the best interests of the child, and the parent's interest in maintaining a parent-child relationship yields to the child's interest in a stable, loving home life. *Id.* At this point, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Id.* at 366.

¶ 68 In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52; see also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 69 Here, the trial court found that termination of Moira K.'s parental rights was in K.K.'s best interests. In so deciding, the court found that "the interruption in [K.K.'s] care has already caused damage and decreased life expectancy. And there's nothing in this record to convince this Court that that interruption would not occur in the future." We conclude that Moira K. has not established that the court's best-interest finding was against the manifest weight of the evidence.

31

¶ 70 At the best-interest hearing, the State's witnesses testified that K.K. had improved significantly since being placed into care in February 2018. She was safe in that placement, and all her needs were being met. On the other hand, the evidence demonstrated that Moira K. failed to adequately care for K.K.'s cystic fibrosis, which resulted in her being hospitalized twice within the first two years of her life. K.K. was able to develop her own identify in her foster home; she loved to read, do her hair and nails, and she had girls' weekends with Reside and her older daughter. K.K. looked to her foster parents as "mom" and "dad," and she snuggled with Reside and loved to be held. K.K. also went to the Resides when she was scared, seeking comfort, or hurting in any way. She was attached to her foster siblings, and she wanted to continue living in her foster care placement. Her foster parents were taking the appropriate steps to improve her quality of life, had started teaching her to do some of her treatments on her own, and were homeschooling her. K.K. was integrated into the Kewanee community, as she attended services and programs at the church where her foster father was the pastor.

¶ 71 Reside testified that she and her husband wanted to adopt K.K. They were willing to provide permanency to K.K., and they had the resources to care for her. They also knew the long-term commitment that was required to take care of K.K.'s medical needs. Although she was excited when Moira K. visited her, Fitzgerald-Jackson opined that K.K. viewed her as more of a family friend. Moira K. agreed that K.K. was confused as to their relationship. K.K. referred to Moira K. by her first name rather than acknowledging her as her mother.

¶ 72 Moreover, the CASA best-interests report determined that it would be detrimental to K.K.'s well-being to be removed from her placement with her foster family and returned to Moira K. The LCFS best-interests report found that the Resides were taking care of K.K.'s medical needs with no apparent issues, but the "same could not be said for [Moira K. or Cody K.] who in the first two years of [K.K.'s] life had her in the hospital for failure to thrive not once but twice." Fitzgerald-Jackson did not have any concerns with K.K.'s placement with the Resides, and he opined that it would be traumatic for K.K. to be removed from their home.

¶ 73 Given the above evidence, we conclude that, after considering the statutory factors, the trial court's finding that it was in K.K.'s best interests to terminate Moira K.'s parental rights was not against the manifest weight of the evidence.

¶ 74                                    III. CONCLUSION

¶ 75 For the foregoing reasons, we affirm the judgment of the circuit court of Effingham County.


¶ 76 Affirmed.